J-A27045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| D.J.G., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| T.G., | |
| Appellee | No. 698 WDA 2014 |

Appeal from the Order entered March 31, 2014,
in the Court of Common Pleas of Westmoreland County,
Civil Division, at No(s): 552 of 2009-D

BEFORE:   FORD ELLIOTT, P.J.E., SHOGAN and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:            **FILED DECEMBER 24, 2014**

D.L.G. ("Father") appeals from the Custody Order continuing the parties' shared legal custody of their son, M.G. ("Child") (born in October 2006), awarding T.G. ("Mother") primary physical custody of Child, awarding Father partial physical custody of Child, and granting Mother's Petition to Relocate with Child to Alabama, under the Child Custody Act ("the Act"), 23 Pa.C.S.A. §§ 5321-5340.[1]  We affirm.

Mother lives with Child and her nineteen-year-old daughter, C., in Mount Pleasant, Westmoreland County, Pennsylvania.  N.T., 3/17/14, at 41-42.  Father lives in Moon Township, Allegheny County, with his mother and

---

[1] As the custody trial in this matter was held in March 2014, 23 Pa.C.S.A. §§ 5321 to 5340, is applicable.  **C.R.F. v. S.E.F.**, 45 A.3d 441, 445 (Pa. Super. 2012) (holding that, if the custody evidentiary proceeding commences on or after the effective date of the Act, *i.e.*, January 24, 2011, the provisions of the Act apply).

stepfather. *Id.* at 187; N.T., 3/19/14, at 18. Father signed an acknowledgement of paternity for Child, and has been adjudicated Child's legal father in prior legal proceedings. N.T., 3/17/14, at 43-47.

Mother and Father were never married. *Id.* at 48. Father resided with Mother and C., and later with Child, between the summer of 2006 and January 2009. *Id.* at 48-49. At that time, Father moved to his present home. *Id.* at 49.

On March 26, 2009, Father filed a Complaint for Custody of Child. On June 26, 2009, the trial court entered a Custody Order awarding the parties shared legal custody, Mother primary physical custody, and Father partial physical custody. Subsequently, the trial court scheduled a full custody trial for February 2010.

On February 23, 2010, the trial court entered an Order modifying the Custody Order with regard to Father's partial physical custody rights. After several modifications, on November 16, 2010, the trial court entered a Custody Order, with the consent of the parties, awarding the parties shared legal custody, and awarding Mother primary physical custody and Father partial physical custody.

After other procedural matters not relevant to this appeal, including a modification entered on November 27, 2012, Mother filed a Petition for Modification of a Partial Custody or Visitation Order and Request for Relocation ("Petition to Relocate") on June 25, 2013. Mother sought

permission to move to Alabama with Child, because of employment for her fiancé, P.R. After an expedited hearing, the trial court entered an Order denying Mother's request for temporary relocation, and scheduling a full relocation trial. Trial Court Order, 9/19/13. The trial court further appointed a guardian *ad litem* ("GAL") to represent Child's interest. *Id.* Finally, the trial court directed that the November 16, 2010 Custody Order, as modified by the November 27, 2012 Order, would remain in effect.

At the full relocation trial, Child testified *in camera*, and was questioned by Mother's counsel, Father's counsel, and the GAL. Mother testified on her own behalf, and presented the testimony of P.R. Father also testified on his own behalf.

Child testified that Mother had advised Child that it would be better if Child moved with her to Alabama. N.T., 3/17/14, at 12. Child testified that it would be "okay" if he stayed in Pennsylvania. *Id.* at 13. According to Child, when he visited Alabama, it rained on two of the days, and Mother almost flooded her car. *Id.* at 14. Child acknowledged that P.R. was nice to him. *Id.* at 14-15.

Child testified regarding Father's statement that Child would never see Father again if relocation took place. *Id.* at 11. Child indicated that Father had ceased making such statements at the request of the GAL. *Id.* at 11-12. Child testified, however, that Father's statement had scared Child. *Id.* at 16. Child stated that he loves Father, and testified that if Child moved to

Alabama and did not see Father for a few months, Child would run "all the way from Alabama" to Moon Township. *Id.* at 20, 26. Child stated that he did not want to move to Alabama because he did not like it there. *Id.* at 32. He acknowledged that he had shared with the GAL his fear of not seeing Father again. *Id.* at 32-34. Child acknowledged that he had told the GAL that he wanted to stay with Father as his first choice, even if Mother did not relocate to Alabama. *Id.* at 35-36.

Mother testified that she began dating P.R. in January 2011. *Id.* at 49-50. At that time, P.R. had a separate residence in Canonsburg, Washington County, Pennsylvania. *Id.* at 50. In July 2013, P.R. relocated to Decatur, Alabama, for purposes of his employment. *Id.* at 51. Mother testified that P.R. contributes financially to the support of Mother's household. *Id.* at 51-52.

Mother testified regarding her employment as a training technician at the 911th Air Lift Wing, at the Air Force base in Pittsburgh. *Id.* at 52. Mother has a civilian/military job, where she is rated a GS-7 as a civilian, and a tech sergeant E6 in the military. *Id.* Mother's workday begins at 6:30 a.m., and ends at 3:00 p.m. *Id.* For her job, Mother travels fifty-six miles to and from work, driving one hour and ten minutes each direction. *Id.* at 53. Father's home is approximately five minutes from the Air Force base in Coraopolis, Moon Township. *Id.* at 60. Mother's gross income is $39,000. *Id.*

Mother testified that she is on active duty status with the military. *Id.* at 54. In July 2013, Mother was medically disqualified from worldwide duty because of insulin dependence. *Id.* Mother applied for a waiver to allow her to remain in her civilian portion of her duty at a desk job in Pittsburgh, but, at the time of the custody trial, she had not received a final decision. *Id.* at 54-57. Upon relocation to Alabama, and if Mother is permitted to remain in the military, Mother would continue to return to Pittsburgh for her reserve weekends once per month, and her annual fifteen-day tour. *Id.* at 57-58. Mother testified that Decatur, Alabama, is 676 miles from Mount Pleasant, Pennsylvania, with a one-way travel time, by car, of eleven hours and nineteen minutes. *Id.* at 59. Mother stated that she has traveled to Decatur twice. *Id.* Mother drove both times, but P.R. has both driven and flown to Decatur. *Id.*

Mother testified that she has completed all necessary courses for a master's degree in secondary education, with the exception of her student teaching, and plans to pursue a career in education. *Id.* Mother did not complete her student teaching because she could not afford to give up her employment for nine weeks. *Id.* at 54.

Mother stated that she had been offered, via telephone, a job as a director of the space camp at the Redstone Arsenal, an Army base located fifteen minutes from Decatur in Madison, Alabama, at a salary of $60,000, but declined the position because of the start date. *Id.* at 60-61. Mother

testified that she also had been offered a job at Redstone Arsenal, in the child development center, at her current rate of pay, and an Information Technology ("IT") position through Man Tech, which she declined because of the start date. *Id.* at 61-62.

Mother has applied for assistance in locating a teaching position, through a program called Troops to Teachers. *Id.* at 62. Mother explained that, in living with P.R. in Alabama, she would be able to complete her student teaching, with the assistance of a $5,000 grant from the Veterans Administration and the Troops to Teachers program. *Id.* According to Mother, she is not financially able to student teach in Pennsylvania, as she is the head of her household and has expenses in excess of the $5,000 grant. *Id.*

Mother testified that because she plans to live with P.R. in Alabama, it is not critical for her to secure immediate employment, as P.R. has sufficient income to support her and her two children. *Id.* at 62-63. Mother testified that she could earn the same amount of money, if not more, in Alabama. *Id.* at 63. Mother stated that the distance between her and P.R., and the maintenance of two households, has placed a strain on their relationship. *Id.* After P.R. moved to Alabama, Mother saw P.R. once a month, while he was on military duty in Pennsylvania. *Id.* at 64. Since P.R. retired from the military in February 2014, he no longer strains their finances by traveling to Pittsburgh each month. *Id.*

Mother testified that moving to Alabama will improve her life and the life of her family. *Id.* Mother stated that she and Child are a family unit with P.R., and that P.R. is close with Child. *Id.*

At the time of the custody trial, Child was attending first grade at Rumbaugh Elementary School in Mount Pleasant, Pennsylvania. *Id.* at 65. Mother looked into a school in the Madison/Huntsville area in Alabama, which is rural, and looked into a school in Decatur, which is more urban and similar to Penn Hills or Greensburg. *Id.* Mother stated that both school districts are very good. *Id.* Mother testified that Child is developmentally on target, and that he does not have any type of individualized education program, nor does he need any type of medication, therapy or counseling. *Id.* at 65-66. She stated that Child does not have any diagnosed behavioral problems. *Id.* at 66.

Mother explained that Child has only visited Alabama once, in July 2013. *Id.* During the four days that Mother and Child spent in Alabama, the temperature was 75 degrees, and the weather was rainy to the point of flooding. *Id.* at 66-67. Mother has spoken to Child about moving to Alabama, specifically the change in schools, the weather, and the availability of swim teams, since Child swims. *Id.* at 67. Mother stated that Child is active with a swimming team, and that Father has attended between four and six swim meets over the past two years. *Id.* at 69. The swim team is active year-round, but Child was taking the summer off. *Id.* at 69-70.

Mother testified that, at first, Child wanted to move, but after speaking with Father, Child believed that he would never see Father and therefore has changed his mind. *Id.* at 68. Mother stated that, as a seven-year-old, Child does not understand the situation, and does not wish to hurt the feelings of either parent. *Id.* at 68-69. Father pays Mother $95 per month for child support, and Mother pays for Child's medical insurance. *Id.* at 70. Mother stated that she would not relocate with Child until after the school year in Pennsylvania has ended. *Id.* at 70-71.

Mother plans to move with Child into a three-bedroom house in Decatur, which P.R. was renting, until they decide on a house to purchase. *Id.* at 71. Mother explained that, under the Custody Order then in place, during the school year, Father has partial physical custody of Child on alternating weekends from after school until 7 p.m. on Sunday. *Id.* During the summer, on his alternating weekends, Father has partial physical custody from Friday at 6:30 a.m. until Monday at 3:00 p.m. *Id.* Father is not employed. *Id.* at 72.

Mother testified that communication between her and Father is terrible, and that he refused to pay expenses for Child's school clothes in the fall of 2013. *Id.* Mother explained that she and Father have communicated through text messages for the past five years. *Id.* at 72-73. Mother stated that Father had attempted to send her romantic cards when they were

ordered to attend co-parent counseling, but stopped communicating with Mother when he found out she was seeing someone else. *Id.* at 73.

Mother testified that, under the Custody Order then in place, as modified, Father may call Child on Wednesday evenings, but has made little contact by telephone, and only began contacting Child when he knew that the parties were going to court. *Id.* at 73-74. Mother stated that the calls last between two and five minutes, and that the call is on speakerphone, because Child continues to play the Minecraft video game during the call. *Id.* at 74. Mother testified that Father has not participated in Child's parent-teacher conferences or open houses at school, although she notified Father about them. *Id.* According to Mother, Father takes Child at holidays so that he can show off Child to his family. *Id.* Mother explained that Father has two other children, but Child has not seen them since Father lost custody of the other children three or four years ago. *Id.* at 74-75.

Child stayed with his maternal grandmother in Virginia for two weeks in 2007, during Mother's duty with the Air Force in Germany, and for two weeks again in 2011, during Mother's duty in Puerto Rico. *Id.* at 75. Father declined to take physical custody of Child during those time periods. *Id.* In 2013, Mother stated, Father decided "he could be a stellar father" and exercised physical custody of Child during her six-week military assignment in Mississippi. *Id.*

Mother proposed a custody schedule with Father having four to six weeks with Child in the summer, and Child returning to Alabama approximately two weeks before school starts. *Id.* at 75-76. Mother also proposed that, if she stays in the military, she could bring Child to Pennsylvania during her long weekends on duty. *Id.* at 76. Mother also stated that Father may come to Alabama to see Child at any time. *Id.* Mother states that she has offered to alternate Christmas and Easter vacations with Father, and to allow Father to keep his $95 to allow him to pay for air travel and gas so that he can make trips to Alabama. *Id.* at 76-77.

Mother testified that, according to Child, Father speaks ill of her to Child on custodial weekends, but Child's statements are sometimes far-fetched. *Id.* at 77-78. Mother believes that Child loves Father, but that his love is based on a lie. *Id.* at 78. Mother opined that, although there will be trauma for Child related to the move, Child is resilient enough to handle a relocation to Alabama because he makes friends and adjusts to things quickly. *Id.* at 78-79. Mother acknowledged that that she was reported to the Children's Bureau of Westmoreland County and investigated, but the report was determined to be unfounded. *Id.* at 79-80.

Mother testified as to her concern that Father allows Child to play with a BB gun, and to ride a quad vehicle at his home. *Id.* at 80. She also is concerned that Child is hungry when she picks him up from Father's home.

*Id.* at 83. According to Mother, Father now sends Child back from visits with a snack, such as soured grapes, which she considers to be a "feeble attempt" to feed Child. *Id.* Mother testified that she never receives a phone call from Child when he is at Father's home. *Id.* at 162.

P.R. has lived in Decatur, Alabama since July 2013. *Id.* at 166-67. P.R. explained that his property in Canonsburg was a marital asset in his divorce proceedings, which are not yet completed. *Id.* at 167-68. P.R. testified that he has been separated from his wife since March 2010. *Id.* at 168. P.R. retired on February 2, 2014, after twenty-six years of service in the Air Force. *Id.* at 169-71. P.R. moved to Decatur, Alabama for a position with a Defense Contract Management Agency ("DCMA"), as an inspector with space crafts. *Id.* at 171. P.R. has searched for similar employment in the Pittsburgh area for approximately two years. *Id.* at 174-75.

P.R. testified that he is renting a home in Decatur, and hopes to purchase a home in the area. *Id.* at 175. P.R. explained that the cost of living is lower in Alabama with regard to housing, utilities and gasoline. *Id.* at 175-76. According to P.R., he drives twelve hours to Pennsylvania, once per month. *Id.* at 177. P.R. stated that he calls Mother every day, and occasionally speaks with Child. *Id.* P.R. likes Child, and plays Nerf guns with him. *Id.* at 177-78. After his relationship became serious with Mother, P.R. spent the majority of his time in her home and with her children. *Id.* at 178.

P.R. assists Mother with her bills, and intends to continue if relocation is approved. *Id.* at 179. P.R. is paid $75,000 a year at his current employment. *Id.* P.R. testified that he would facilitate a relationship between Child and Father. *Id.* at 180. P.R. has three daughters, ages 30, 23, and 22. *Id.* at 180-81. He indicated that, although not divorced, he has proposed to Mother, and that his divorce was taking longer than expected. *Id.* at 181. P.R. would prefer to live in Decatur, Alabama, where he would have more money, a great job, and there would be more opportunities for Mother. *Id.* at 182-83. P.R. indicated that, as a backup plan, he could relocate back to Pennsylvania. *Id.* at 182.

Father testified that in 2009, he moved in with his mother and stepfather, when Child was approximately three years old, and that he has remained in their home. *Id.* at 187. During the school year, Mother picks up Child from Father's house on Sunday every other week, and she sometimes picks up Child at 3:00 p.m. or 3:30 p.m. on her reserve duty weekends, as the base is near Father's home. *Id.* at 188. The then-existing Custody Order, as modified, provided Father with one week of vacation time with Child, alternating every other year. *Id.* at 188-89.

Father was honorably discharged from the United States Marine Corps with a service-connected lower spine injury. *Id.* at 189. While Father was dating Mother, he was considered to be 100% unemployable, and received $3,200 per month. *Id.* at 190. At the time of the custody trial, Father was

considered to be partially disabled, and received $1,124 per month as his only source of income. *Id.*

Father testified that he has an excellent relationship with Child. *Id.* at 191. He rides sleds with Child in the snow, and plays Nerf guns with Child. *Id.* Father also testified that he attended all of Child's swim meets, and has switched custodial weekends with Mother so that Child may compete in a swim meet with both parents present. *Id.* at 190-91. Father explained that he takes Child swimming at his local YMCA, and that he plays Minecraft on Xbox with Child. *Id.* at 192-93. Additionally, Father testified that he plays board games with Child, takes Child on camping trips, and shoots BB guns with Child. *Id.* at 193. Father approves of Child's use of the BB gun with protective eyewear and proper supervision. *Id.* Father once allowed Child to ride a quad, and provided Child with protective gear. *Id.* at 194. Moreover, Father plays soccer, football, and baseball with Child, and takes Child fishing. *Id.* at 194-95.

Father testified that Mother has refused to bring Child to his home when it is not Father's custodial time. *Id.* at 195. Father has difficulty communicating with Child on the telephone because the calls are placed on a speakerphone, and Child is distracted by playing Minecraft or being questioned by someone in the background. *Id.* at 196. When Father leaves a message at a time other than the appointed time for phone calls, his

messages are not returned, or Mother refuses to allow him to speak with Child. *Id.* at 197-202.

Father testified that he has attended Child's swim meets, even in Somerset, Pennsylvania, and has some of Child's swimming ribbons from the competitions. N.T., 3/19/14, at 4-9, 12-14. He stated that Mother has refused to bring Child to his home when school was cancelled because of the weather. *Id.* at 10-12. In June 2013, Father received a Father's Day card from Child, signed by Child, which he interpreted to mean that his interaction with Mother was improving. *Id.* at 14-16.

Father took custody of Child for two months, during Mother's active duty time in Mississippi, and he had enrolled Child in school in the Moon School District until her return. *Id.* at 33-34. Father stated that he did not object when Mother went to Germany for active duty, and Child went to the home of his maternal grandmother in Virginia for two weeks, as the custody Order provided that Child was to spend one week a year with his maternal Grandmother. *Id.* at 35-36. Father presented two receipts for clothing that he had purchased for Child: a winter coat in October 2013, and children's clothing for Christmas 2013. *Id.* at 37-39. Father testified that it is not in Child's best interests to move to Alabama, because Child has been a part of Father's family in Pennsylvania. *Id.* at 42-43.

During cross-examination by Mother's counsel, and upon questioning by the trial court concerning his disability income, Father stated that, when

he was receiving a full monthly benefit, his income totaled $3,124 per month. *Id.* at 56. However, during a fraud investigation, Father's 100% unemployable status was changed to partially disabled. *Id.* at 54-57. The investigation resulted in a determination that Father had not committed fraud. *Id.* at 56-58. Father testified that the amount of his back pay was being calculated, and he had not yet received it, and he did not want Mother requesting more child support for Child. *Id.* at 58. Father also explained that Child would be covered under Father's health insurance when Father's income reinstatement occurred. *Id.* at 60.

Father testified that had not seen his two other children, males ages 15 and 13, for two or three years prior to the custody trial, but he was uncertain as to the length of time. *Id.* at 66-68. Father explained that his partial custody of his other two children was ordered to be supervised as an outcome of family counseling. *Id.* at 86. He stated that he had not exercised this custody for the last three years because he spent an incredible amount of money on the litigation. *Id.* at 87. Father testified that he was giving his two older sons a "dose of tough love," and waiting for them to pick up the phone and want to resume their relationship with him. *Id.*

Father testified that he did not recall Mother asking him for money to buy school supplies for Child. *Id.* at 76. When confronted with the September 2012 text messages between Father and Mother, Father

conceded that he told Mother to use her child support money for school supplies, explaining that he was "just rattling her chains by saying use the child support money." *Id.* at 83. Father claimed that he was unable to provide financial assistance for Child's school supplies in the fall of 2013, except for the jacket he bought for Child. *Id.*

Father stated that he takes seventeen prescription pills each day, and could only name twelve of those prescriptions. *Id.* at 77-82. When confronted, Father acknowledged that during a weather-related school cancellation, Mother texted him that she would not bring Child to visit because of the time of day and the weather. *Id.* at 84-85.

Father testified that he has discussed with Child the proposed relocation, and indicated that to Child that he did not want relocation because he loves Child. *Id.* Father testified that he did not believe Child understood the travelling time, and that the matter was not being presented in a way that Child could understand it. *Id.* Father told Child that there would be times that they would not see each other. *Id.* at 88. He denied leading Child to believe that he would never see Father again. *Id.*

Father testified that he was seeking primary physical custody of Child, regardless of whether Mother remained in Pennsylvania or relocated to Alabama. *Id.* at 88-89. Father stated that he, his parents, and extended family would provide the environment that would be in Child's best interests. *Id.* at 89-90.

On March 31, 2014, the trial court entered a Custody Order granting the parties shared legal custody of Child, awarding primary physical custody to Mother, and granting Mother's Petition to Relocate with Child to Alabama. On April 4, 2014, the trial court filed an Explanation of Decision.[2]

Father timely filed a Notice of Appeal and a Concise Statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i) and (b).[3] On June 5, 2014, the trial court filed a Letter, which we accept as a Statement in Lieu of a Rule 1925(a) Opinion, addressing the issues raised in Father's Concise Statement.

In his brief on appeal, Father raises one issue:

Whether the trial court's conclusion that the best interests of [Child] would be served by granting [Mother's] [P]etition [to] [R]elocat[e] to the State of Alabama is manifestly unreasonable in light of the sustainable findings of record[?]

---

[2] This Court has stated that

[i]n expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, ___ Pa. ___, 68 A.3d 909 (2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). *Id.*

*A.V. v. S.T.*, 87 A.3d 818, 822-23 (Pa. Super. 2014).

[3] We note that the trial court's docket page has a clerical error, erroneously listing the filing date as April 3, 2014, whereas the date stamp on the Notice of Appeal and Concise Statement reflects April 30, 2014.

J-A27045-14

Father's Brief at 8.[4]

In custody cases, our standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**C.R.F.**, 45 A.3d at 443 (citation omitted).

The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

**Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

---

[4] Father states his issue on appeal in his brief somewhat differently from the issues stated in his Concise Statement. We, nevertheless, find it preserved for this Court's review.

-18-

*M.A.T. v. G.S.T.*, 989 A.2d 11, 18-19 (Pa. Super. 2010) (*en banc*) (quotation and citations omitted).

Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the child. 23 Pa.C.S.A. § 5338. Where a request for relocation of the subject child along with a parent is involved, the trial court must consider the following ten relocation factors set forth within section 5337(h) of the Act:

> **(h) Relocation factors.—**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:
>
> (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the non[-]relocating party, siblings and other significant persons in the child's life.
>
> (2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.
>
> (3) The feasibility of preserving the relationship between the non[-]relocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.
>
> (4) The child's preference, taking into consideration the age and maturity of the child.
>
> (5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.
>
> (6) Whether the relocation will enhance the general quality of life for the party seeking the relocation,

including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h); *see also D.K. v. S.P.K.*, 2014 PA Super 218, *6 (stating that the trial court is to consider section 5337(h) factors only when a parent is relocating with the child). "*All* of the factors listed in section 5328(a) [(the best interests factors)] are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original).

In his brief, Father summarized his argument as follows:

The Trial Court erred in granting [Mother's] Petition to Relocate with [C]hild to the [S]tate of Alabama.

[Mother] changed her "story" about her plan for relocating with [C]hild on multiple occasions, but the undisputed facts of record showed that [Mother] was seeking to relocate with [C]hild to the State of Alabama without having done a single search into homes in that area. The facts of record also show that [Mother] had done no research into which school [C]hild would attend, that she was unable to even name the school district where he would attend, that she was unable to identify the county where [C]hild would live, and that she had no job lined up for her

future employment. [Mother] offered no evidence showing that the quality of life of [Child] would be improved with a move to Alabama but rather, was clearly just interested in following [P.R.] (a married man) to Alabama since his employment took him there. The evidence clearly indicated that she desired to alienate [Child] from [F]ather and replace him with [P.R.] because he had more money than [Father].

In short, the Trial Court had facts before it which very clearly required a denial of [Mother's] request to relocate to the State of Alabama since [Mother] failed to carry her burden of proof under 23 Pa.C.S.A. Section 5337.

Father's Brief at 20.

Father concedes that the trial court's Explanation of Decision addressed each of the section 5337(h) relocation factors, but complains that the court's analysis lacks substance. *See id.* at 23. In his Statement of Questions Involved and Summary of Argument, Father does not challenge the trial court's consideration of the section 5328(a) best interests factors. He simply argues that Mother failed to satisfy her burden of proof with regard to section 5337(h). *Id.* at 20. Thus, Father has waived any challenge to the section 5328(a) best interest factors. *See Krebs v. United Ref. Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by a Concise Statement of Errors Complained of on Appeal and the Statement of Questions Involved section in the appellate brief is deemed waived); *see also* Pa.R.A.P. 2116.

In addition to the above-stated issue, Father's brief sets forth a string of challenges to the trial court's consideration with regard to factors

5337(h)(1),[5] (3), (4), (5), (6), (7), and (8) without providing any supporting case law for each factor he challenges, and without providing any citations to the record for his arguments. Moreover, Father does not divide his brief into as many parts as there are separate questions to be argued, as he raises numerous questions throughout his brief.

Pursuant to Pennsylvania Rule of Appellate Procedure 2119(a), "[t]he argument shall be divided into as many parts as there are questions to be argued . . . followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). In addition, Rule 2119(b) provides that "[c]itations of authorities must set forth the principle for which they are cited." Pa.R.A.P. 2119(b). "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." **Lackner v. Glosser**, 892 A.2d 21, 29-30 (Pa. Super. 2006) (citations omitted); **see also In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating, "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

---

[5] Although Father states that his argument is with regard to the second relocation factor, it appears to be with regard to the first factor.

Accordingly, Father has waived the numerous arguments that are interspersed in the Argument portion of his brief. *See Lackner*, *supra*; *In re W.H.*, *supra*; Pa.R.A.P. 2119(a), (b). Nevertheless, even if we did not deem his arguments waived, we would conclude that they lack merit, based on the explanations provided by the trial court in its April 4, 2014 Explanation of Decision.

Here, the trial court took into account the many factors which shaped Child's stated preference to remain in Pennsylvania, and found that Father's statements had influenced Child; Child's preference was not well-reasoned; and Child's preference was based on his fear of never seeing Father again.[6] *See* Explanation of Decision, 4/4/14, at 5. After a careful review of the record in this matter, including the notes of testimony from the hearing on September 17, 2013, and the custody trial on March 17, 2014, and March 19, 2014, we conclude that the trial court's decision is not unreasonable, based on the evidence before the trial court. The trial court's findings as to credibility and its weight determinations with regard to the evidence related to section 5337(h) are sustainable. We therefore affirm on the basis of the Trial Court's April 4, 2014 Explanation of Decision. *See* Trial Court Explanation of Decision, 4/4/14, at 1-19.

---

[6] Regarding a child's preference, this Court has long stated that the child's preference must be based on good reasons, and his intelligence must be considered. *McMillen v. McMillen*, 602 A.2d 845, 847 (Pa. 1992). "The weight to be given a child's testimony as to his preference can best be determined by the judge before whom the child appears." *Id.*

With regard to Father's argument that the trial court's decision was contrary to the recommendation of the GAL, Father failed to raise this claim in his Concise Statement and Statement of Questions Involved; accordingly, it is waived.[7]  **See Krebs**, **supra**.  As the trial court's findings and conclusions are supported in the record, there was no abuse of discretion.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/24/2014

---

[7] Had Father preserved the issue, we would conclude that the trial court was not bound to accept the recommendation of the GAL appointed in this case. **See M.A.T.**, 989 A.2d at 19-20 (recognizing that while a trial court must consider the testimony of a custody evaluator, it is under no duty to follow the expert's recommendations, so long as its independent decision is supported in the record).

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA
CIVIL DIVISION-CUSTODY

D. G.
      Plaintiff,     )
             )
             )
v.            )   No. 552 of 2009-D
T. G.          )
             )
      Defendant.   )

## EXPLANATION OF DECISION

In accordance with 23 Pa. C.S.A. §5323(d), the Court sets forth the reasons for its decision

in this matter. After hearing an Expedited Relocation Hearing (September 17, 2013), and a full

Relocation Trial (March 17, 2014 and March 19, 2014), reviewing the exhibits, and the factors set

forth in 23 Pa. C. S. A. §5328(a) (custody) and 23 Pa. C.S.A. §5337(h) (relocation), the Court enters

the following Explanation of Decision.

### Relocation

First, the Court must consider the nature, quality, extent of involvement and duration of the

child's relationship with the party proposing to relocate and with the nonrelocating party, siblings

and other significant persons in the child's life. In the instant case, Mother and Father resided

together until the child was approximately two (2) years old. At which time, Father moved out of

Mother's residence and back into his parents' residence in Moon Township, Pennsylvania. Since

that time, Mother has maintained primary physical custody of the minor child.[1] The minor child has

a maternal half-sister, who is nineteen (19) years old and is currently residing with the Mother and

---

[1] There was an instance when Mother went to Mississippi for six (6) weeks as part of her military obligations and Father had primary custody of the minor child until her return. Upon her return, the previous custody order was reinstated and Mother again, had primary physical custody.

1

the minor child in Mt. Pleasant, Pennsylvania. It appears that the minor child has a good relationship with his older half-sister. The minor child has two paternal half-brothers but they have not seen Father since February of 2011[2] and have no real relationship with the minor child. The minor child testified that he has not seen his half-brothers since he was four (4) years old. The child appears to have a close relationship with both parents and at least one of his half siblings.

Second, the Court must consider the age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

The minor child is seven (7) years old and is in the first grade at Rumbaugh Elementary School in the Mt. Pleasant School District. Mother testified that if she were permitted to relocate, she and the minor child would not move until the end of the school year so that the minor child's education would not be disrupted mid-school year. The Court received no evidence that the minor child currently has any special needs. While the Court acknowledges that any move can be hard for a child, the Court finds that moving a child at this young age and during the summer is less traumatic than moving an older child or moving a child during the school year. Mother testified that there will be a period of adjustment for the minor child but that she feels that he makes friends easily and that he will adjust pretty quickly once he has a chance to settle in.

Third, the Court must consider the feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

---

[2] The Court took Judicial Notice of Father's custody Order addressing Father's other two sons. The Order is dated December 1, 2011, and awards Father supervised periods of partial custody, at the children's request, pending Father's completion of the custody evaluation. The Order further provides that once Father completes the psychological evaluation, the matter was to be set up for an automatic review before the Court.

In the instant case, the Court has entered an Order which provides Father with partial custody time throughout the school year and with an extended period of time in the summer. During the school year, Father is awarded partial physical custody of the minor child for Labor Day weekend from Friday until Monday. Mother is to pay to fly the minor child to Pennsylvania and home from this period of partial physical custody. In even-numbered years, Father shall have minor child from the Wednesday before Thanksgiving until the Sunday after Thanksgiving, and again from December 27 until the next to the last day of winter break. In odd-numbered years Father is awarded partial physical custody of the minor child from the second day of winter break until January 2. The Order of Court also awards Father partial physical custody for the President's Day weekend from Friday until Monday. Mother is to provide airline transportation for the minor child for the President's Day period of partial custody. Father is also awarded partial physical custody with the minor child every spring break/Easter holiday. During the summer, Father is awarded four (4) weeks of partial physical custody of the minor child from the last week in June through the third week in July. The above schedule is based on the school calendar for the Decatur City Schools.[3] Father may also make arrangements with Mother to visit the minor child in Alabama provided adequate notice is given under the Order.

Due to the distance and the costs of travel, the Court has ordered certain times that Mother must fly the child to Pennsylvania so as to maximize Father's custodial time. The Court is very aware of the rising costs of travel and it is the opinion of the Court that if Mother wishes to relocate, she must bear the burden of the majority of the minor child's travel costs.

---

[3] The first day of school for the 2014-2015 school year is August 7, 2014.

3

In accordance with the Order of Court, Father will have partial physical custody time with the minor child in the months of June, July, September, November (in even-numbered years), December, January, February, and April. This is not including anytime that Father wishes to visit with the minor child in Alabama.

Based on the above, the Court finds that the relationship between the Father and the minor child can be preserved despite permitting the relocation of the minor child.

Fourth, the Court must consider the child's preference, taking into consideration the age and maturity of the child.

The Court heard the testimony of the minor child *in camera* and in the presence of counsel for both Mother and Father and the Guardian ad Litem. Due to the child's age and maturity level, his preference was not given much weight by the Court.

The minor child testified that he does not want to move to Alabama and wants to live with his Father. However, the minor child was told by his Father that if he was permitted to move to Alabama, Father would never see him again. It is the opinion of the Court that the minor child believes that he will not see his Father again if he moves despite being reassured by Mother and the Guardian ad Litem. The minor child admitted that Father's statement scared him and that he was afraid that he would never see his Father again. The Court also found that the minor child's first Alabama experience was not a favorable one in that it was extremely bad weather and he observed flooding for the first time. Mother testified and the Court agrees that the minor child thinks Alabama is always going to have bad weather and flooding. Additionally, the minor child testified that Father discusses the custody case with him a lot and that Mother told him that the move would

4

make things better. The minor child further stated that he likes Pete Rose, Mother's fiancé, and that is who they would be living with in Alabama if the Court permits the relocation.

In addition to the child's age and level of maturity, the Court found the minor child's preference to be based on a fear of never seeing his Father again. The influence of Father's statement on the minor child is very apparent to the Court and the Court does not feel that the minor child's preference is well-reasoned.

Fifth, the Court must consider whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

The Court heard testimony from both parties that the other is attempting to interfere with their relationship with the minor child. The Court finds that both parties are guilty of some level of interference. However, the Court also notes that when push comes to shove, the parties seem to be able to work out the majority of their differences without outside intervention.

Next, the Court must consider whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotion benefit or educational opportunity.

The Court finds that Mother's general quality of life will be enhanced by relocating to Alabama and moving in with her fiancé. Mother testified that her current financial situation is tenuous and she is facing the real possibility of losing her military/civilian position for health reasons. She further testified that she is currently in the process of appealing the decision of the military to medically disqualify her due to her insulin dependence. Mother's current civilian employment is directly tied to her military position. While the Court finds that it is not immediately necessary for Mother to locate new employment, it will become necessary if the military denies her

5

appeal. Additionally, Mother's military obligation will terminate in one year. Unless the military grants her appeal and Mother agrees to re-enlist in the military, it will become necessary for Mother to locate new employment within the next year or so. Mother testified that there are a lot more employment opportunities for her in Alabama and that she has already been offered a couple of jobs in Alabama. Both Mother and her fiancé testified that the cost of living is lower in Alabama and by combining their households; they can reduce some of their expenses.

With regard to the emotional benefit of Mother's relocation, the Court finds that Mother has been in a relationship with Mr. Rose since January of 2011. They are engaged but have been waiting to set a wedding date because Mr. Rose's divorce has not been finalized[4] and they were waiting for the outcome of this court case. The parties have been in a relationship for several years and appear to be quite close. The Court finds that Mother relocating to Alabama will provide Mother with a large emotional benefit.

The Court must also consider whether the relocation will enhance the general quality of life for the minor child, including, but not limited to, financial or emotional benefit or education opportunity. The Court finds that the relocation will enhance the minor child's quality of life. As previously stated, the financial situation of Mother's household is tenuous at best. Mother is facing the possibility of losing her employment within in the next year either because of her medical condition or because her military obligation will come to an end. Mother further testified that she has had to ask Mr. Rose to help her pay some of her bills when she is short on money. Due to Father's current situation, he is unable to provide extra money for support of the minor child. Father reluctantly testified that he is in the process of reestablishing his 100% unemployable status

---

[4] Mr. Rose testified that his divorce case has been pending for approximately four (4) years.

6

and will receive an increase in his benefits as well as back pay.[5] The relocation of Mother and the child to Alabama to reside with Mr. Rose will reduce some of the expenses that Mother is paying and should in turn provide Mother with more available money for things that the minor child may need.

With regard to the emotional benefit, the Court finds that the minor child has never lived with anyone except his Mother. The Court notes that there were three (3) brief periods of time when Mother was serving her military obligation and the minor child resided twice with the maternal grandmother and once with the Father. Father testified that the two (2) times the maternal grandmother had the minor child while Mother was completing her military time; the minor child did not do well emotionally. Father had the minor child for six (6) weeks in 2013 while Mother was in Mississippi completing a military obligation. Father testified that he had no issues with the minor child. Father is seeking to stop the relocation of the minor child and is requesting primary physical custody. If this Court granted Father's request, the minor child would be moving to a new county and a new school near Father's residence.[6] The Court finds that any move can be tough on a minor child but moving coupled with a complete change in primary physical custody is particularly hard for a minor child. The Court finds that the minor child will benefit emotionally from making this transition with Mother and maintaining the consistency and stability that he is used to. After hearing the testimony of the minor child, the Court does not believe that it has even occurred to the

---

[5] Father had been receiving full monthly benefits of $3124.00 until someone turned him in for fraud. While investigating the fraud allegation, Father was moved from the status of 100% unemployable to 60% disabled which drastically lowered his monthly benefits. The fraud allegation was investigated and it was determined that Father committed no fraud and is now awaiting his final hearing to have his full benefits reinstated with back pay. Father testified at trial that he was hoping this information did not come out because he did not want Mother seeking more child support.

[6] The Court acknowledges that in 2013, while Father had the minor child for six weeks, the minor child was enrolled temporarily in a new school near Father's residence. The Court was not provided any information regarding whether or not this is the school the Father would be enrolling the minor child in if he was awarded primary physical custody.

7

discussions about the relocation is unacceptable but to then tell the child that he will not see his Father again is reprehensible.

The Court further questions Father's motives for opposing the relocation and seeking primary physical custody. The Court heard testimony regarding Father's relationship with his other children. The Court took Judicial Notice of Father's most recent custody order in his other custody case.[7] The Order is dated December 1, 2011, and provides that pending the completion of the custody/psychological evaluation; Father has supervised partial physical custody with his other minor children so long as they request time with their Father. The Order further provides that once Father pays his 38% share of the evaluation costs and the evaluations are complete, the matter will be set for an automatic review before the Judge. Father testified that he has not seen his other minor children since early in February of 2011, and that he is still hoping that the children decide to have a relationship with him.

The Court has concerns about Father's motives because he has not taken any steps in his other custody case to secure a relationship with his other children since 2011. It concerns the Court that Father is seeking to replace his broken relationship with his other minor children with this relationship. The Court applauds Father for being involved but it is concerning because it appears that his regular involvement started once he realized that this child may be permitted to relocate. The Court notes that Father always exercises his periods of partial custody but his involvement in the child's activities and schooling seems to have come about within the last year.

It is for the above reasons that Court has found that Mother met her burden of proof in accordance with 23 Pa. C.S.A.§5337(i)(1).

---

[7] The Court notes that it is also the Court for Father's other custody case. *See* Westmoreland County docket number 2209 of 2002-D. The Court was involved in the case until 2011 when all activity in the matter ceased.

9

## Custody

First, the Court must look at which party is more likely to encourage and permit frequent and continuing contact with the other parent. In the instant case, the Court found that Mother was more likely to encourage and permit frequent and continuing contact with Father. While it does not appear that Mother is as willing to give "extra" time as she could be, the Court found that she was more than willing to devise a proposed custody arrangement that provided time for Father to spend with the minor child. Additionally, Father complains that Mother does not permit him to have regular phone contact with the minor child. However, the Court recognizes that the minor child is seven (7) years old and probably does not wish to speak on the phone for any great length of time with anyone. Mother testified that there have been times that the minor child will speak with his Father while he is playing video games or is otherwise distracted. The Court understands that this is frustrating to Father but it is the nature of a young child. The Court does note that the minor child rarely calls Mother when he is in his Father's custody.

Next, the Court looked at present and past abuse committed by a party or a member of the party's household. The Court specifically asked the parties about prior abuse and Protection from Abuse Orders (hereinafter "PFA"). It appears that Father's first wife had a PFA Order against him back in 2003 and that Mother had two (2) PFAs against Father in 2009. Father also filed a PFA against Mother. One of the PFAs between Mother and Father was cross-filed and both resulted in one (1) year protection orders. There have been no recent PFA filings or allegations of abuse in this matter.

In accordance with the recent amendment to 23 Pa. C.S.A. §5328, the Court will also address any information regarding child abuse. The Court received no evidence from any of the

10

parties that the minor child has been the subject of an indicated or founded report of child abuse. Further, there was no evidence provided that Mother or Father or any member of their households has been found or indicated as a perpetrator of child abuse. There are current Westmoreland County Children's Bureau filings. Mother testified that the Westmoreland County Children's Bureau did investigate an allegation against her but the allegation was unfounded and closed.

The Court acknowledges that Mother and Father lived together as an intact family until the minor child was approximately two (2) years of age. Since that time, Mother has been the primary caretaker for the minor child. The minor child has consistently lived with the Mother and Mother has provided for the minor child's daily needs. The Court notes that only recently did Father become involved in the minor child's activities and schooling. Father exercised his periods of partial custody but was not overly involved with the child's activities such as swimming or school.

With regard to the need for stability and continuity in the child's education, community, and family life, the Court found that both Mother and Father are providing the minor child with a stable and loving home when he is in their custody. With regard to education, the Court notes that Mother testified that Father never attended a parent-teacher conference or school open house. Father presented no evidence to the contrary. With regard to continuity of family life, the minor child has always resided with his Mother and his sister. The minor child would spend periods of partial custody with Father but his school, community, and activities are all centered around Mother's home. The Court acknowledges that the minor child is close to his Father's family but the Court believes the custody order will provide plenty of opportunity for the minor child to spend time with Father's extended family.

11

Obviously, with any relocation, the minor child's community and education will be temporarily disrupted until the minor child has had a chance to adjust to a new community and school. However, Mother testified that she has already looked into the possibility of swim teams for the minor child in the area of Decatur, Alabama. Mother testified that she would not be relocating the minor child until after the school year ended. The timing of the relocation should provide the minor child the opportunity to adjust to his new surroundings before he begins his partial custody summer schedule with his Father.

Father requested primary physical custody of the minor child but provided the Court with no testimony as to what school the minor child would attend, how he would handle childcare arrangements, and what his proposed order would be if Mother was permitted to move or if Mother elected not to move.

With regard to availability of extended family, the minor child appears to be close the maternal grandmother and to the paternal grandmother and paternal step-grandfather. The minor child has been to visit his maternal uncle in Kentucky but due to the distance, does not appear to be overly close to him. Father testified about the minor child having a relationship with various members of his extended family including cousins, uncles, and aunts. The Court finds that the custody order will provide the minor child plenty of opportunity to spend time with Father's extended family during the summer and over the holidays.

The Court also examined the minor child's sibling relationships. Mother has one other child, a nineteen (19) year old daughter. She currently resides with Mother and the minor child. The minor child seems to be close to her and was able to tell the Court all about her current employment and the status of her college education. Father has two minor sons to his ex-wife. As

12

previously stated, Father has not had a relationship with his minor sons since February of 2011. The minor child in this case testified that he has not seen his half-brothers since he was approximately four (4) years old.

The Court previously discussed the well-reasoned preference of the child earlier in this Explanation of Decision.

The Court also examined attempts of the parents to turn the minor child against the other parent. As previously discussed, Father told the minor child that he would never see him again if he moved to Alabama with his Mother. Father admitted to speaking with the minor child about the relocation because he did not feel that Mother was being honest about the distance and time involved if the child were permitted to move. The minor child admitted to the Court that his Father's statements about the relocation scared him. Father's discussions with the minor child deeply concerned this Court as Father clearly did not take the child's emotional well-being into consideration prior to making the statement. Father put the child in fear unnecessarily and for his own selfish gain. Father clearly put the minor child in the middle of this case. The Court did not find that Mother has made any attempts to alienate the child from Father. The minor child told the Court that his Mother told him that the move would be better.

The Court found that both Mother and Father are likely to maintain loving, stable relationships with the minor child. The Court found that currently the minor child is close to both parents. Despite Father's attempts to make Mother's relationship (and the minor child's relationship) with Mr. Rose appear to be unstable, the Court finds that the relationship appears to be solid and that Mr. Rose is a good influence on both Mother and the minor child. The Court had the benefit of hearing Mr. Rose testify as to his current divorce situation. He also testified that it is very

13

important for the minor child to spend quality time with Father and that he is committed to ensuring that the minor child maintains a good relationship with Father. The Court found Mr. Rose to be reasonable and caring about Mother and the minor child. Mr. Rose did not come across as someone looking to replace Father or undermine his role as a parent. The Court further found that the minor child likes Mr. Rose. The Court notes that Mr. Rose testified that if the relocation was denied, he would attempt to locate employment in the local area. While the Court appreciates Mr. Rose's dedication to his relationship with Mother and the minor child, there is no guarantee that he would find suitable employment in the local area. Additionally, if he did manage to find suitable employment in the local area, there is no guarantee as to the pay and benefits that would be available to him and ultimately Mother and the minor child. Mr. Rose currently has a good job in Decatur, Alabama and is more than able to establish a home for Mother and the minor child.

The Court found that Mother is likely to attend the daily physical, emotional, developmental, educational, and special needs of the minor children. Mother has been the primary caretaker of the minor child since the parties separated when the minor child was two (2) years old. Mother has handled his education and been regularly involved in his school and activities. As previously noted, Father has not attended any of the minor child's parent-teacher conferences or open houses. Mother is the parent responsible for involving the minor child with his swim team. While Father has recently started attending swim meets, Father credits Mother for helping make the minor child an excellent swimmer. The child does not currently have any special needs and on track to move onto the second grade next year.

With regard to proximity of residences, the Court will address this factor with regard to Mother's relocation to Decatur, Alabama. Mother submitted an exhibit which indicates that the

14

residences are approximately 676 miles with a drive time of a little over eleven (11) hours. Due to the distance, the Court has ordered that Mother send the minor child to Pennsylvania via airplane (for certain periods of partial custody) at her expense so as to maximize the child's time with Father. The Court does not find it reasonable for the minor child to be in the car for that length of time for every period of partial physical custody with Father. Additionally, the Court has ordered that Father be given partial physical custody periods if he makes the trip to Alabama to see the minor child.

The Court also examined each party's availability to care for the child and make childcare arrangements. Father is currently unemployed and is usually available to the care for the minor child. Father did not testify as who would provide childcare in his absence but the Court surmises that he would use the paternal grandmother if she was available as Father currently lives with her. With regard to Mother, it appears that the minor child is in school while Mother is at work or is in daycare during the summer. Mother testified that she has used both maternal grandmother and Father for childcare in the past. The Court also believes that the minor child's older half-sister would also be able to provide childcare for Mother if necessary.

Mother and Father currently have a high level of conflict. The Court believes that this high level of conflict is largely due to the current custody proceedings and Mother's desire to relocate. Mother testified that the parties' ability to communicate is poor. Both Father and Mother submitted text messages exchanged by the parties and it appears that they both need to make a better effort to communicate with regard to their son. The Court also believes that the level of conflict has been heightened because of Mother's unhappiness with her current situation. Mother is facing the possibility of the a job loss, her fiancé has moved to Alabama for employment, her financial

15

situation is tenuous and she does not feel that Father is doing his part to help financially with the minor child. The Court feels that once Mother and the minor child relocate, Mother will be in a much better situation and the situation between Mother and Father will improve. Ironically, Father testified about receiving a Father's Day card from the minor child and how touched he was to receive the card. The Court is confident that Mother helped the minor child purchase the card for the Father. Father testified that the child is an incredible swimmer and he attributes that completely to Mother and her work with the child. The above statements are proof that the parties are able to see the good in the other and are able to find the value in the other parent.

With regard to a history of drug and alcohol abuse of the parties and/or members of their households, the Court found that neither Mother nor Father has a history of drug or alcohol abuse. There was no evidence presented at trial that any adult in this case suffered from a current or past issue with drugs or alcohol.

The Court also examined the mental and physical conditions of the parties and their household members. Mother testified that she is an insulin dependent diabetic. Father testified that he has been declared 100% unemployable due to his various physical conditions. He suffers from back issues, has had a major heart attack, had stents implanted, suffers from a blood disorder, had ankle reconstructed, has bad knees, and has had his nose reconstructed. Father further testified that he is currently on seventeen (17) different prescribed medications including Hydrocodone and Vicodin for pain, a muscle relaxer, and Valium. The Court notes that Father was unable to name all of the medications he is currently prescribed. Father testified that he does not believe his various physical conditions will impair his ability to adequately parent the minor child.

16

## Opinion of the Guardian ad Litem

The Guardian ad Litem filed a report in this case prior to trial and then provided the Court with a supplemental report at the conclusion of the trial. It is the opinion of the Guardian ad Litem that Mother's relocation with the minor child should be denied because of the uncertainties of what is waiting for them in Alabama. The Guardian ad Litem feels that consistency and stability are crucial for someone so young and to move the minor child to another state without certainty in the details is not preferable. Further, the Guardian ad Litem believes the Court should give much weight to the preference of the minor child. While acknowledging that a child of seven (7) years of age should not be responsible for making such a life-altering decision, the Guardian feels his position should be greatly considered given the totality of the circumstances in this case. With regard to Father's request for primary physical custody, the Guardian ad Litem finds no merit in switching primary custodians in this case. The Guardian believes that the minor child should have consistency and stability in his life and changing the primary custodian would only serve to disrupt those things. However, the Guardian is in favor of expanding Father's partial physical custody in the summer.

The Court feels that it is important to note that while it has the utmost respect for the Guardian ad Litem it sees this case very differently. The Court agrees that consistency, stability, and certainty are all very important qualities and are necessary to properly raise a child. However, the Court found that while there are some uncertainties associated with the relocation to Alabama, there are plenty of uncertainties present in the child's life in Pennsylvania. Currently, Mother is facing the loss of her job whether she is disqualified by the military or her military obligation ends. Mother is currently the primary financial support for the minor child. The Court is in no way

17

deciding this case purely on finances but the reality is that children are expensive and constantly need clothing, food, and shelter. Mother has been consistently providing the essentials for the minor child since his birth. The Court does not fault Father for his situation however, if Father was a single father of the minor child, he would be required to get money in some fashion, whether it is working or borrowing from friends and family, to provide the essentials for the minor child. A lack of financial resources, regardless of which parent is struggling, creates all kinds of uncertainties for a child. Mother is currently in a situation which is not one of her own making. She is facing a job loss due to a medical condition. She has absolutely no control over the decision of the military. Mother is currently struggling financially and she is working full time. If she loses her employment, life for the minor child will change almost instantly. All of the consistency, stability and certainty that the minor child appears to have will be lost. The Court finds that Mother is doing the best she can with the situation she has been dealt.

The Court found that while the child's relocation has some uncertainties, the minor child's current life has many uncertainties. The Court found the benefits of the relocation outweigh the benefits of the minor child staying in Pennsylvania.

Additionally, the Court notes that Mother is currently working at the 911th Airlift Wing in Coraopolis, Pennsylvania. The 911th Airlift Wing has been the subject of many recent news reports due to a potential closure. The fate of the 911th Airlift Wing is very much up in the air and many of the local politicians have been fighting to keep it open. There is no guarantee as to how long it will remain open and operational.

18

After a complete trial on the matter, the Court is granting Mother's Petition for Relocation and finds the custody arrangement, as set forth in the previously issued Custody Order, is in the best interest of the minor children.

BY THE COURT:

Date:   April 1, 2014

_____
Michèle G. Bononi, Judge

ATTEST:

_____
Prothonotary

cc:     Diane Murphy, Esq. for Mother
        Heidi Norton, Esq, for Father
        Patricia Elliott, Esq., Guardian ad Litem
        file